# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

---

United States of America,                            Crim. No. 08-254 (MJD/JJK)

               Plaintiff,

v.

Michael Andrew Gross,                     **REPORT AND RECOMMENDATION**

               Defendant.

---

William J. Otteson, Esq., Assistant United States Attorney, counsel for Plaintiff.

Steven J. Meshbesher, Esq., Meshbesher & Associates, PA, counsel for
Defendant.

---

This matter is before this Court on Defendant Michael Andrew Gross's

Motion to Suppress Evidence Obtained by Search and Seizure (Doc. No. 34),

and Motion to Suppress Statements (Doc. No. 61).  This Court held a hearing on

the motions on October 14-16, 2008,[1] and received testimony from the following

six witnesses: Officer Andrew Gubash of the West St. Paul Police Department

and the Dakota County Drug Task Force; Officer Jay Senne of the Burnsville

Police Department; Analyst Nicholas Reedy of the Drug Enforcement

Administration; Special Agent Timothy Mellor of the Drug Enforcement

---

[1]     The Court issued an Order on motions dated October 16, 2008, taking
Defendant's Motion to Suppress Evidence Obtained by Search and Seizure
(Doc. No. 34), and Motion to Suppress Statements (Doc. No. 61), under
advisement for submission to the District Court on Report and Recommendation.
(Doc. No. 70.)

Administration; Detective Mari Askerooth of the Airport Police Department; and

Agent Rick Porras of the Burnsville Police Department and the Dakota County

Drug Task Force.  The Court received eight exhibits from the Government,

including the search warrants and supporting affidavits at issue.  The matter was

referred to the undersigned for Report and Recommendation pursuant to 28

U.S.C. § 636 and Local Rule 72.1.  For the reasons stated below, this Court

recommends that Defendants' Motion to Suppress Evidence Obtained by Search

and Seizure be denied, and Defendants' Motion to Suppress Statements be

granted.

## BACKGROUND

Defendant's motions stem from the execution of two search warrants and

the events surrounding the execution of those warrants.

On July 22, 2008, United States Magistrate Judge Susan Richard Nelson

issued a warrant to search a specifically described location in Burnsville,

Minnesota, including all of the buildings, land, and appurtenances located

thereon.  (Hearing Ex. No. 2.)  The supporting affidavit further specifically

described the location as the residence of Defendant.  The search warrant

identified the objects of the warrant as: controlled substances, including

marijuana; records relating to the importation, distribution, and possession of

controlled substances; items relating to domestic travel; items and documents

evidencing the obtaining, secreting, transfer, and/or concealment of assets and

the obtaining and/or secreting currency equivalents; currency, precious metals,

stones, jewelry, financial instruments and ledgers, and sales receipts; photographs, video tapes, and slides; records indicating occupancy, residency and/or ownership of the premises; paraphernalia for packaging, weighing, and distributing controlled substances; identification documents; and items, documents, and records relating to the operation of controlled-substance sales, repackaging, and redistribution.

Magistrate Judge Nelson issued the warrant on the basis of probable cause contained in the Affidavit of Timothy J. Mellor, including information received from Special Agent Laurel Pistel of the United States Department of the Interior's Bureau of Land Management regarding searches and seizures in California relating to the "Gonzalez organization"; information received from a confidential source; information regarding the stop of an individual named Heather Richards; information obtained through surveillance; and information received through a consent search of a rental vehicle.

On July 23, 2008, at approximately 11:15 a.m., law enforcement personnel from the Drug Enforcement Administration, Internal Revenue Service, Airport Police Department, Dakota County Drug Task Force, and Burnsville Police Department, executed the search warrant at Defendant's residence.  Defendant was not present at the residence at that time.  At some point during the search, Burnsville Police Department Officer Senne learned that Defendant's vehicle had been identified as entering the neighborhood.  Officer Senne and Agent Patrick

Gast of the Dakota County Drug Task Force then left the Defendant's residence
in Officer Senne's marked squad car to attempt to locate Defendant.

Officer Senne and Agent Gast, along with officers in two other vehicles,
located Defendant's vehicle in the left turn lane of West River Hill Drive in
Burnsville.  The three vehicles approached Defendant's vehicle from behind.
Officer Senne testified that he learned through radio communication that the
driver (*i.e.*, Defendant) was "making movements of like stuffing something under
their front seat."  (Doc. Nos. 72 & 74, Hearing Transcript ("Tr.") at 53.)  This,
along with the information that Officer Senne had learned from briefing prior to
executing the search warrant about Defendant's possession of a handgun,
resulted in the officers conducting a "high-risk" traffic stop of Defendant's vehicle.
(*Id.*)

After the two marked squads activated their emergency lights, Defendant
stopped his vehicle.[2]  The officers exited their vehicles and pointed their service
weapons at Defendant's vehicle.  Officer Senne then gave verbal commands to
Defendant to stick both of his hands out of the window, exit his vehicle, continue
to look away from Officer Senne's voice, and to walk backwards toward the
sound of Officer Senne's voice.  Defendant was then handcuffed, placed into the
back of Officer Senne's car, and was driven to Defendant's residence by Officer

---

[2]     Two additional marked squad cars also arrived on the scene, with one
uniformed police officer in each.

Senne.[3]  Officer Senne testified that it took approximately twenty minutes from the time of the stop until the time they returned to Defendant's residence.

Upon arrival at Defendant's residence, Defendant was removed from Officer Senne's vehicle and placed onto the backseat of Agent Porras's minivan, which was parked on the street outside of Defendant's residence.  During the transfer, and while Defendant was in Agent Porras's minivan, Defendant remained handcuffed behind his back.  In the minivan, Agent Porras and an unidentified officer sat on the front seats.  Within about five minutes, Agent Mellor entered the minivan and sat next to Defendant on the backseat.  Both Agent Porras and Agent Mellor testified that Defendant was not free to leave at that time.  Defendant was not given *Miranda* warnings while he was in the minivan.

Agent Mellor testified that he "explained to [Defendant] why [they] were there, why [they] were executing the warrant, that [Defendant] had information that [they] believed would be helpful in the investigation, and [he] wanted to speak to [Defendant] about that."  (Tr. at 131.)  Agent Mellor testified that Defendant originally said that "[h]e didn't have information." (*Id.*)  According to Agent Mellor's testimony, he then told Defendant that he did not believe Defendant was telling him the truth.  (*Id.* at 132.)  Agent Mellor then explained to Defendant that he believed Defendant did have

---

[3]     During the ride back to Defendant's residence, Officer Senne engaged Defendant in casual conversation.  Defendant does not argue, however, that the statements made to Officer Senne in his squad car should be suppressed.

information and that "based upon [their] investigation that [Defendant]

would have information, that [they were] looking for his cooperation[.]"  (*Id.*

at 131-32.)  According to Agent Mellor, Agent Porras made similar remarks

to Defendant.  (*Id.* at 133-34.)  Agent Mellor testified that some time

subsequent to this exchange, Defendant said, "Yes, there's some things

we could talk about."  (*Id.* at 133.)   At some point during Agent Mellor's

conversation with Defendant, Agent Mellor asked Defendant if he had any

knowledge of individuals involved in marijuana trafficking.  Defendant

responded saying that "there was an individual known to him, a female

named Tara." (Tr. at 135.)

The conversation in the minivan lasted approximately five to ten minutes.

Agent Mellor and Agent Porras then escorted Defendant, who still remained in

handcuffs, from the minivan to an office in Defendant's house.  Defendant was

then, for the first time, read his rights pursuant to *Miranda*, and interviews

commenced first by Agent Mellor and then by Detective Askerooth.

During the course of the search of Defendant's residence, pursuant to the

warrant issued by Magistrate Judge Nelson, marijuana and cocaine were found,

along with approximately $8,000.00 in U.S. currency, duffle bags with what

appeared to be marijuana residue, records reflecting a high volume of cash

transactions, purchased money orders, cash receipts for gasoline purchases

between California and Minnesota, and a receipt in Defendant's name dated July

22, 2008, reflecting payment for rental of Unit E236 (the "storage locker"), a

storage locker at Gopher Mini Storage, for the period July 22 to August 21, 2008. Based on these findings, a Dakota County Sheriff's Deputy and member of the K-9 Unit went to the storage locker with a dog trained in detecting the odor of controlled substances. The dog alerted on the storage locker, indicating that the odor of a controlled substance was present inside the storage locker.

Based on all of the above, on July 23, 2008, Special Agent Mellor submitted an application and supporting affidavit for a search warrant to search the location described as Unit E236, located at Gopher Mini Storage, 10685 165th Street West, Lakeville, Minnesota. (Hearing Ex. No. 3.) The supporting affidavit further identified Unit E236, located at Gopher Mini Storage, 10685 165th Street West, Lakeville, Minnesota, as being rented in the name of Defendant. The search warrant identified the objects of the warrant as those same objects listed in the July 22, 2008 search warrant. Magistrate Judge Nelson issued this second warrant on the basis of probable cause contained in an Affidavit of Timothy J. Mellor, which included all of the same information cited in his earlier July 22, 2008 Affidavit, along with the additional information learned through the execution of the July 22, 2008 search warrant, including reference to the receipt in Defendant's name pertaining to the rental of the storage locker. During the search of the storage locker, marijuana was found.

At approximately 6:00 p.m. on July 23, 2008, several officers, including Agent Gast and Detective Askerooth, transported Defendant from his residence to the Burnsville Police Department. There, Defendant was brought to a

conference room where Detective Askerooth read Defendant his *Miranda* rights. Thereafter, Defendant was interviewed by Detective Askerooth, Agent Porras, Agent Mellor, and DEA Analyst Nick Reedy.  Approximately the first sixty minutes of the interview was recorded.  The interview continued after the recording stopped for approximately 1-2 hours.

Defendant was subsequently indicted for Conspiracy to Distribute Marijuana in violation of Title 21, United States Code, Sections 841(a)(1), 841(b)(1)(B), and 846.

## DISCUSSION

## I.    Motion to Suppress Evidence

Defendant challenges the search warrants[4] issued in this case based upon a lack of probable cause on the four corners of the supporting affidavits.  Based on this challenge, Defendant moves to suppress the physical evidence seized from the specifically described location in Burnsville, and from the storage locker.

Searches conducted pursuant to a warrant are reviewed to determine whether the information in the warrant application and supporting affidavit provided probable cause for the search.  *Illinois v. Gates*, 462 U.S. 213, 236 (1983).  "Probable cause exists when, given the totality of the circumstances, a

---

[4]    In Defendant's Supplemental Memorandum (Doc. No. 81), Defendant specifically challenges whether the information contained in Agent Mellor's July 22, 2008 affidavit establishes probable cause.  Because the same information that is contained in Agent Mellor's July 22, 2008 affidavit is also contained in Agent Mellor's July 23, 2008 affidavit, the Court construes Defendant's argument as challenging both search warrants based on lack of probable cause.

reasonable person could believe there is a fair probability that contraband or evidence of a crime would be found in a particular place." *United States v. Fladten*, 230 F.3d 1083, 1085 (8th Cir. 2000) (citing *Gates*, 462 U.S. at 236). When determining whether probable cause exists, a court does not evaluate each piece of information independently, but, rather, considers all of the facts for their cumulative meaning. *United States v. Allen*, 297 F.3d 790, 794 (8th Cir. 2002). The task of a court issuing a search warrant is "simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit . . . including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Gates*, 462 U.S. at 238; *see also United States v. Salter*, 358 F.3d 1080, 1084 (8th Cir. 2004). When information in the application for the search warrant is provided by a confidential informant, the totality of the circumstances must show that the information is sufficiently reliable. *United States v. Lucca*, 377 F.3d 927, 933 (8th Cir. 2004) (citing *Gates*, 462 U.S. at 233). Sufficient reliability may be shown through "corroboration by other evidence, or if the informant has a history of providing reliable information." *Lucca*, 377 F.3d at 933 (citing *United States v. Williams*, 10 F.3d 590, 593 (8th Cir. 1993)).

In reviewing the decision of the issuing court, this Court must ensure that the issuing court "'had a substantial basis for . . . conclud[ing] that probable cause exists.'" *United States v. Oropesa*, 316 F.3d 762, 766 (8th Cir. 2003)

(quoting *Gates*, 462 U.S. at 238-39).  Since reasonable minds may differ on whether a particular search warrant affidavit establishes probable cause, the issuing court's determination is accorded great deference.  *United States v. Wajda*, 810 F.2d 754, 760 (8th Cir. 1987) (citing *United States v. Leon*, 468 U.S. 897, 914 (1984)).

Defendant asserts that Agent Mellor's affidavits[5] state only that Defendant engaged in "some forms of behavior that were moderately suspicious, attended by a multiplicity of innocent explanations, remote in time and place, and far from meeting the necessary threshold of probable cause."  (Doc. No. 81, Def.'s Supplemental Mem. in Supp. of Mots. to Suppress Statements and Evidence Obtained by Search and Seizure 24.)  In summary, Defendant more specifically argues that (1) Agent Mellor does not connect the number that accompanied the name "Jew" in Noa Corona Gonzalez's[6] cellular telephone and "E.Jew" in Heather Richards's[7] cellular telephone to Defendant; (2) there is a lack of

---

[5]     Special Agent Mellor's July 22, 2008 and July 23, 2008 affidavits include identical information, except that the July 23, 2008 affidavit also includes a section entitled, "Information Relating to Gross Learned through Execution of Search Warrant on July 23, 2008."  (*See* Hearing Exs. 2 and 3.)

[6]     Law enforcement has uncovered evidence that the "Gonzalez organization" is connected with certain marijuana trafficking activities in California.  Located in the address book of a cellular telephone seized from Gonzalez was a contact for an individual listed as "Jew."

[7]     The Utah Highway Patrol stopped Richards in November 2007.  She was in possession of approximately sixty pounds of marijuana, and her telephone
(Footnote Continued on Next Page)

information relating to the Source of Information's ("SOI") reliability; (3) the reliability of the SOI was not independently corroborated in this matter; (4) the information regarding the name "Jew" or "E.Jew," and the information provided from the SOI that he knew Defendant as "Jewboy" or "Jew," is stale in time and remote in proximity to the Midwest, and did not support that there would be illicit activity ongoing at Defendant's residence; (5) the knives and OC spray that were observed by an officer at Defendant's residence in response to an incident report are not indicative of a connection with multi-state drug trafficking; (6) the fact that an officer observed, during prior surveillance of Defendant's residence, a white male come out of Defendant's garage with a bag and then discard the bag in a dumpster located at a house under construction nearby, does not corroborate the informant's allegation of criminal activity; (7) the reliability of the canine's purported "alert" to the center console of the rental vehicle returned by Defendant was not supported by foundation; and (8) the "odor" of narcotics found in the rental vehicle returned by Defendant should carry little weight when the vehicle was presumably utilized by other drivers prior to Defendant.

Upon reviewing Agent Mellor's two Applications and Affidavits for Search Warrants in their entirety, the Court finds that they established probable cause for the search warrants. As set forth above, this Court's role is simply to "make a

(Footnote Continued from Previous Page)
included a number (the same number found in Gonzalez's phone listed for "Jew") listed for "E.Jew."

practical, common-sense decision" about whether there is a "fair probability" that officers will discover contraband.  *See Gates*, 462 U.S. at 238.  The search warrant applications stated, among other things, that (1) Gonzalez's address book in his phone contained "Jew" as a contact; (2) Richards' address book in her phone contained "E.Jew" as a contact; (3) both "Jew's" phone number and "E.Jew's" phone number were the same phone number, with a Minnesota area code; (4) the SOI identified the Defendant from his driver's license photograph as "Jewboy," and stated that Defendant was introduced to him as "Jewboy" or "Jew" at the Holiday Inn Express in Ukiah, California in mid-2007; (5) the SOI spent time with Defendant and Richards at the Holiday Inn Express in Ukiah, and there, Defendant told the SOI that he was receiving $3,600.00 per pound of marijuana; (6) hotel records show that Defendant stayed at the Holiday Inn Express in Ukiah in early October 2007, and reported being from Rosemount, Minnesota, which is where his brother resides;  (7) the SOI met Defendant because of a meeting between Gonzalez and Defendant that was arranged by Richards wherein Gonzales provided Defendant with eight or nine pounds of marijuana and $3,500.00 in exchange for a Lincoln Navigator vehicle; (8) Agent Mellor determined that a 2004 Lincoln Navigator is registered to Defendant in Minnesota, and that that same Lincoln Navigator is registered to Gonzalez's wife in California; (9) the SOI claims that Richards told him that Defendant was her contact in Minnesota and assisted her financially in growing her marijuana; (10) a K-9 alerted to the center console of the rental vehicle that Defendant had just

returned for the odor of narcotics; and (11) a search of public records showed

that Defendant was the owner of the residence-at-issue in the warrant.

In addition to the above, the application supporting the search warrant for

the storage locker explained that the execution of the search warrant on

Defendant's residence resulted in  the seizure of the following evidence:

(1) suspected marijuana and cocaine; (2) approximately $8,000 in U.S. currency

found in an empty food box in Defendant's trash; (3) duffle bags with what

appeared to be marijuana residue; (4) records reflecting a high volume of cash

transactions, purchased money orders, and cash receipts for gasoline purchases

between California and Minnesota; and (5) a receipt in Defendant's name dated

July 22, 2008, reflecting payment for the storage locker for the period July 22 to

August 21, 2008.  The affidavit also states that a dog trained in detecting the

odor of controlled substances alerted on the storage locker, indicating that at

least the odor of a controlled substance was present inside the storage locker.

The Court concludes that the totality of the circumstances here shows that

the information received from the SOI is sufficiently reliable.  The affidavit

includes reference to corroboration by other evidence (*i.e.*, Gonzalez and

Richards' phone contacts, hotel records, vehicle registrations), and the SOI did

have a history of providing reliable information (*i.e.*, the SOI had previously

accurately identified rural trails utilized to reach outdoor marijuana grows and

described vehicles used by a member of the Gonzalez organization).  All of the

above referenced information established a fair probability that drugs would be found in Defendant's home and in the storage locker.

Therefore, the evidence seized pursuant to the search warrants for the specifically identified location known as Defendant's residence, including all of the buildings, land, and appurtenances located thereon (Hearing Ex. No. 2), and the storage locker described as Unit E236, located at Gopher Mini Storage, 10685 165th Street West, Lakeville, Minnesota (Hearing Ex. No. 3), were not unlawfully obtained in violation of the constitutional rights of Defendant.  Both search warrants were based on sufficient probable cause as stated in the Affidavits of Timothy J. Mellor and as determined by United States Magistrate Judge Nelson.[8]  The warrants properly and sufficiently identified the location of the search and the items to be seized.  The search warrants in this matter were

---

[8]     Even if probable cause did not exist, there was a facially valid warrant and the good faith exception to the exclusionary rule, established in *United States v. Leon*, 468 U.S. 897 (1984), would have to be considered.  "Under the good-faith exception, evidence seized pursuant to a search warrant that lacked probable cause is admissible if the executing officer's good-faith reliance on the warrant is objectively reasonable." *United States v. Perry*, 531 F.3d 662, 665 (8th Cir. 2008).  "The good-faith inquiry is confined to the objectively ascertainable question whether a reasonably well trained officer would have known that the search was illegal despite the [issuing judge's] authorization." *United States v. Proell*, 485 F.3d 427, 430 (8th Cir. 2007) (alteration in original) (quotations omitted).  "When assessing the objective [reasonableness] of police officers executing a warrant, [the Court] must look to the totality of the circumstances, including any information known to the officers but not presented to the issuing judge." *Id.* at 431 (alteration in original) (quotations omitted).  Here, this Court concludes that the good-faith exception would apply.  There is no evidence to suggest that the officers' reliance on the warrants was not in good faith, nor is there evidence that the officers' reliance was not reasonable.

lawfully issued, and there is no requirement for suppression of evidence seized pursuant to the warrants.  Therefore, this Court recommends that Defendant's Motion to Suppress Evidence Obtained by Search and Seizure (Doc. No. 34) be denied.

## II.    Motion to Suppress Statements

Defendant contends that any statements made by him in his residence and at the Burnsville Police Department should be suppressed because the statements were not made after a valid waiver of Defendant's rights pursuant to *Miranda*.  In other words, despite the reading of the *Miranda* advisory to Defendant in his home office and at the Burnsville Police Station, and despite Defendant's purported waiver of his rights, Defendant contends that such advisories and waivers were rendered invalid based on the questioning that was conducted in Agent Porras' van without *Miranda* warnings.

As a preliminary matter, the Government states that it does not intend to use any incriminating statements made by Defendant before Agent Mellor administered the *Miranda* warnings.  Even so, the Government asserts that none of the pre-*Miranda* conversations constituted "interrogations" for which a *Miranda* warning was required.  In addition, the Government contends that the Court should deny Defendant's motion as it pertains to his post-warning statements, arguing that *Missouri v. Seibert*, 542 U.S. 600 (2004), only requires the suppression of incriminating statements when government agents engage in a deliberate strategy to circumvent *Miranda*, and here there is no support showing

15

such deliberate strategy.  The Government has not, however, identified any incriminating statements made by Defendant at either the home interrogation or the police station interrogation.

### A.    Statements made pre-*Miranda* warnings

The Fifth Amendment privilege against self-incrimination protects individuals from being forced to testify against themselves.  U.S. Const. amend. V.  *Miranda* warnings must be given before any interrogation of a suspect in custody may take place.  *Miranda v. Arizona*, 384 U.S. 436, 460-61 (1966).  Before the government may introduce an incriminating statement made by a defendant, it must prove a voluntary, knowing, and intelligent waiver of the accused's rights under the Fifth Amendment.  *Id.* at 475.

The requirements of *Miranda* arise only when a defendant is both in custody and being interrogated.  *United States. v. Head*, 407 F.3d 925, 928 (8th Cir. 2005).  Because it is undisputed that Defendant was in custody and had not yet been advised of his rights when the discussion in the minivan took place, the issue is whether any statements made by Defendant in the minivan resulted from interrogation.  *See United States v. Broines*, 390 F.3d 610, 612 (8th Cir. 2004). Interrogation includes both direct questioning by officers and words or actions that officers should know are "'reasonably likely to elicit an incriminating response from the suspect.'"  *Id.* (quoting *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980)).  Voluntary statements that are not in response to interrogation are

admissible with or without the giving of *Miranda* warnings.  *Head*, 407 F.3d at 928.

The Government argues that any statements made by Defendant in the minivan were not the result of an interrogation because Agent Mellor was not asking Defendant to make statements, but only to listen to the efforts that law enforcement had made that led them to suspect him and to search his house. Although that may have been Agent Mellor's intention, the record reflects that questions were asked of Defendant, and were asked in a particularly coercive environment—Defendant was handcuffed, seated in an enclosed vehicle with only officers present, and seated in very close proximity to the speaking officer.[9]

---

[9]     Agent Mellor's testimony as to the conversation with Defendant in the minivan is as follows:

> Q:     At the time that [Defendant] was in the minivan, did you ask [Defendant] any questions regarding the knowledge of marijuana trafficking?
>
> A:     I believe I, I stated it in terms of "I know you know individuals trafficking."
>
>        . . . .
>
> Q:     Did you ask Mr. Gross if he used marijuana for his own use while he was in the minivan?
>
> A:     I don't recall asking that.
>
> Q:     It's possible, you just don't remember?
>
> A:     I, I don't think – well, I don't see why I would.

(Footnote Continued on Next Page)

(Footnote Continued from Previous Page)

. . . .

Q:    . . .  You asked Mr. Gross if he had any knowledge of individuals involved in marijuana trafficking at that time, is that correct?

A:    Right.

Q:    Did he provide any names or he just said he didn't know anyone?

A:    He said that there was an individual known to him, a female named Tara.

Q:    He told you that in that van?

A:    He did.

Q:    This is before a Miranda warning had been read to him?

A:    That's correct.

Q:    And this is with three officers, two of which you and Agent Porras had both asked him questions back and forth?

A:    Not so much questions asked.  This is your situation.  You know, we known you know, that line of questioning.

Q:    And then he provided the name of Tara.

A:    That he knew this Tara who was involved.

Q:    This is after you and Agent Porras had asked him these questions.

A:    Yes.

Q:    Did you ask Mr. Gross at that time if he had taken trips to California?

(Footnote Continued on Next Page)

(Footnote Continued from Previous Page)

A:   I, I can't recall if it was stated as a question or as "I know you've been going to California."

Q:   Okay.  And you also asked him a question or stated as a statement that – you asked him about the sale of vehicles in California, is that correct?

. . . .

This is in the van, now.  You and Agent Porras asked him about going to California, right?

A:   I, I don't recall if that was specifically asked in the van or if that was asked in the office.  I know we told him, "We know you've been going to California," things like that.

. . . .

Q:   Did you ask [Defendant] in the minivan about sources of income and where he got his income to live?

A:   In the van, I, I don't recall that, that we went into that.

Q:   Did you ask [Defendant] in the minivan about his involvement with an individual by the name of Noe Gonzalez?

A:   I don't believe so, not in the van.

Q:   Did Agent Porras do that?

A:   I don't believe he did.

. . . .

Q:   Did you tell [Defendant] about this investigation has been going on for some time?

A:   Yes.

(Footnote Continued on Next Page)

Although most of Agent Mellor's testimony reflects that he was telling the

Defendant what he was doing and what the officers were investigating, Agent

Mellor confirmed that, while in the minivan, he had asked Defendant if he had

any knowledge of individuals involved in marijuana trafficking, and that

Defendant responded saying that there was an individual that he knew named

Tara.  This line of questioning is more than simply telling the Defendant what

Agent Mellor was doing and what the officers were investigating; it instead, in

context, is a line of questioning that was reasonably likely to elicit an

---

(Footnote Continued from Previous Page)

Q:    And you told him that you had known about him way prior to
      July 23rd.

A:    Yes.

Q:    And you told him you had information that you had
      accumulated through your investigation of him.

A:    Yes.

Q:    And you told him some of that investigation had been done on
      surveillance of him in his home.

A:    Yes.

Q:    As well as information that you had obtained in California.

A:    Yes.

Q:    And this was done in the minivan with you and Agent Porras.

A:    That was the initial part of telling him why we were there and
      why we wanted his cooperation, yes.

(Tr. at 134-39.)

incriminating response from Defendant such that the conversation amounted to interrogation.

Further, the Government cites *United States v. Lockett*, 393 F.3d 834, 837-38 (8th Cir. 2005), for the proposition that the practice of officers telling a criminal suspect what was happening, and why they believed a suspect was involved in criminal activity, constitute words and actions "normally attendant to arrest and custody" and are therefore not "interrogation" for *Miranda* purposes.  *Lockett*, however, is distinguishable from the case at hand.  There, the statements made by the officers were in response to inquiries made by the defendant.  Here, Agent Mellor's statements were not in response to any inquiry made by Defendant; Agent Mellor initiated the communication.  In addition, Agent Mellor's inquiries were more than "routine processing-type questions" such as the name and address of a suspect.  *See United State v. Reyes*, 908 F.2d 281, 287 (8th Cir. 1990).  Therefore, because Defendant was in custody and was subjected to interrogation by Agent Mellor in Agent Porras' minivan, and because that interrogation was conducted before Defendant was issued a *Miranda* warning, the Court recommends that any statements that Defendant made in the minivan are inadmissible in the Government's case-in-chief.

### B.    Statements made post-*Miranda* warnings

Defendant argues that his post-*Miranda* statements should be suppressed because they were a continuation of the interview that took place in the minivan, where Agent Mellor failed to give *Miranda* warnings to Defendant.  In response,

the Government argues that the post-*Miranda* statements are admissible

because they were taken in good faith and were not a part of a deliberate, two-

step technique to obtain incriminating statements in violation of *Miranda*.  *See*

*generally Missouri v. Seibert*, 542 U.S. 600 (2004).

The parties dispute the applicability of the Supreme Court's decision in

*Seibert*.  There, a police officer deliberately withheld *Miranda* warnings until

Seibert confessed to criminal activity.  *Id.* at 604-06.  After Seibert confessed, the

officer obtained Seibert's signed *Miranda*-rights waiver and then used Seibert's

pre-warning confession to elicit a repeat post-warning confession.  *Id.*  Seibert's

second confession was admitted at trial.  *Id.* at 606.  A divided Supreme Court

addressed the suppression issue on appeal and held the second confession

inadmissible.

A plurality of four justices questioned the effectiveness of the *Miranda*

warnings when they were administered immediately following a confession and

provided a number of factors for courts to consider every time a suspect first

gives an unwarned confession, is thereafter warned, and then confesses again.

*Id.* at 612-17.  However, Justice Kennedy provided the fifth vote for the Court's

judgment, and decided the case on narrower grounds.[10]  In his view, the

principles of *Oregon v. Elstad*, 470 U.S. 298 (1985), control when the police have

---

[10]     See *United States v. Ollie*, 442 F.3d 1135, 1141 (8th Cir. 2006) (concluding that Justice Kennedy's decision provided the narrower grounds for the decision in *Seibert* and therefore is the rule of decision for lower courts to apply).

not *deliberately* used separate interrogations to elicit incriminating statements through belated *Miranda* warnings.  Under *Elstad*, statements made after a knowing and voluntary waiver of *Miranda* rights are admissible unless there were earlier unwarned statements resulting from coercion or a calculated effort to undermine a suspect's free will.  *Id.* at 309.[11]  However, if a deliberate strategy was used to avoid *Miranda* requirements, *Elstad* does not apply, and post-warning statements related to the substance of what was said earlier are inadmissible in the absence of curative measures.  *Seibert*, 542 U.S. at 621-22 (Kennedy, J., concurring in the judgment).  Thus, Justice Kennedy would suppress post-warning statements only where the police use "the two-step interrogation technique . . . in a calculated way to undermine the *Miranda* warning."  *Id.* at 622.  Because Justice Kennedy decided the case on narrower grounds than the plurality, his reasoning controls.  *See Ollie*, 442 F.3d at 1141 ("Because Justice Kennedy provided the fifth vote and his concurrence resolved the case on narrower grounds than did the plurality, it is his reasoning that rules the present case.").

---

[11]      In *Elstad*, two police officers went to the defendant's home with a warrant for his arrest in connection with a burglary.  *Id.* at 300.  While one officer was in the kitchen with the defendant's mother, the other officer was in the living room with the defendant.  *Id.* at 301.  The officer stated that he told the defendant that he felt the defendant was involved in the burglary and that defendant then told the officer that he was present at the scene of the burglary.  *Id.*  The officers then transported the defendant to the police station, where, approximately one hour later, he was informed of his *Miranda* rights.  *Id.*  The defendant then waived his *Miranda* rights and gave a full statement to the officers concerning his involvement in the burglary.  *Id.* at 302.

The Eighth Circuit in *Ollie* was the first circuit court post-*Seibert* to provide instruction as to which party bears the burden of proof as to deliberateness.  The Eighth Circuit, of course, guides this Court's review.  In *Ollie*, the Eighth Circuit instructed that the government bears the burden of proving by a preponderance of the evidence that the two-step interrogation technique was not a deliberate attempt by the police to undermine the *Miranda* warnings.  Thus, the court held as follows:

> [w]hen a defendant moves to suppress a post-warning statement that he contends was given as part of a question-first interrogation, the prosecution must prove, by a preponderance of the evidence, that the officer's failure to provide warnings at the outset of questioning was not part of a deliberate attempt to circumvent *Miranda*.  Placing that burden on the prosecution is consistent with prior Supreme Court decisions that require the government to prove the admissibility of a confession before it may come into evidence.

*Id.* at 1142-43.

Before this Court turns to the Government's rationale about why the interrogation methods used in this case were not a deliberate attempt to undermine *Miranda*, it is important to review the nature of the interrogation technique that was in fact utilized.  When Defendant was taken back to his residence after the traffic stop and arrest, the police officers elected to put Defendant in the back of a minivan to conduct the initial interrogation described above.  In the van, Defendant was handcuffed behind his back and surrounded by three officers, two in the front seats and one seated next to him in the rear.  No *Miranda* warnings were given.  In the minivan, the officers confronted

Defendant with the nature of their investigation and evidence that they had

gathered about Defendant's criminal involvement.  The officers also elicited

information about Defendant's own involvement in drug trafficking and his

knowledge of the involvement of others.  At the hearing, the officers offered no

explanation for why they chose to put Defendant in the minivan for this

conversation instead of simply taking Defendant into the house, which was their

ultimate destination.

This Court finds that this was a carefully concocted scene chosen by the

police to elicit Defendant's cooperation and information to inculpate him.  It is not

akin to situations where an officer may not realize that a suspect is in custody

and warnings are required or where a defendant blurts out an incriminating

statement unexpectedly before *Miranda* warnings are given.  Given the

Government's lack of explanation about why they started the discussion with

Defendant in the confines of the minivan, it is reasonable to infer that the purpose

of this technique was to create an intimidating setting and make it more likely that

Defendant would not exercise his right to remain silent either in the minivan or

when he was finally moved inside his residence.

The Government presented no testimony from any of the officers that they

were *not* acting in a calculated way to undermine *Miranda* warnings when they

utilized the minivan interrogation.  No officer testified that the failure to *Mirandize*

Defendant in the van was the innocent mistake of an officer who forgot to give

the warnings required by law.  The only testimony relied upon by the Government

about the intent of the agents is that of Agent Mellor, who led the discussion in the minivan.  Specifically, the Government relies on Agent Mellor's testimony that it was "[n]ot originally" his intention to arrest the Defendant that day, but instead the intention was to "see if he would cooperate with law enforcement."   (Tr. at 92.)  This, of course, provides no aid to the Government to help sustain the *Ollie* burden.  While it may have been Agent Mellor's intent at the start of the day merely to see if Defendant would cooperate when the police were going out to Defendant's residence to execute the search warrant, it tells the Court nothing about why the two-step process—including the calculated, no-warning, step-one-minivan interview—was utilized after the Defendant was taken into custody.  In essence, the arrest of Defendant changed the nature of the officers' purported purpose for attempting to communicate with Defendant.  Moreover, the Government presented no evidence that any steps were taken to cure the failure to give *Miranda* warnings in the van.

       In conclusion, the Government has not sustained its burden of proving by a preponderance of the evidence, as required by *Seibert* and *Ollie*, that the two-step interrogation used here was not a deliberate attempt to undermine the *Miranda* warnings given at the residence.  It is important to apply the exclusionary rule to suppress the post-*Miranda* statements in cases like this because otherwise there is too great a risk that savvy police officers would often fall back on using a separate, pre-warning, warm-up interrogation that uses intimidation to overcome the protection of *Miranda*.  If this option existed, "officers

could employ the question-first technique with impunity by simply claiming that a failure to provide warnings was an oversight." *United States v. Ladoucer*, No. 07-165(1) (ADM/JSM), 2007 WL 3051434, at *5 (D. Minn. Oct. 17, 2007) (applying *Seibert* to suppress post-*Miranda* statements taken six days after unwarned statement concluded). This Court recommends that the statements made during the house interrogation be held inadmissible during the Government's case-in-chief. *See id.*

In addition, this Court recommends that Defendant's statements made during the interrogation at the Burnsville Police Station should also be held inadmissible during the Government's case-in-chief. Justice Kennedy explained the following in *Seibert*:

> If the deliberate two-step strategy has been used, postwarning statements that are related to the substance of prewarning statements must be excluded unless curative measures are taken before the postwarning statement is made. Curative measure should be designed to ensure that a reasonable person in the suspect's situation would understand the import and effect of the *Miranda* warning and of the *Miranda* waiver. For example, a substantial break in time and circumstances between the prewarning statement and the *Miranda* warning may suffice in most circumstances, as it allows the accused to distinguish the two contexts and appreciate that the interrogation has taken a new turn. . . . Alternatively, an additional warning that explains the likely inadmissibility of the prewarning custodial statement may be sufficient.

*Seibert*, 542 U.S. at 622. Here, curative measures were not taken. Although several hours had passed between the interview in the minivan and the interview at the Burnsville Police Station, and although the location had indeed changed,

the Government has presented no evidence that the circumstances had changed such that the Defendant would have been able to distinguish the two contexts. *See Ladoucer*, 2007 WL 3051434, at *5 (holding statements that were provided in a post-Mirandized interview that took place six days after a non-Mirandized interview inadmissible).  In fact, the record does not show that the interrogation had taken a new turn.  Instead, the recording of the final interrogation indicates that Defendant was being subjected to similar and related lines of questioning that had been presented to him earlier in the day.  For instance, in the final interrogation, the officers pursued such topics as Defendant's knowledge of other individuals who were trafficking illegal drugs and Defendant's trips to California— topics that were raised by the officers in the minivan.  Indeed, the officers made reference to conversation that had occurred during the previous interviews, and made reference to Defendant's prior statements, including, at the beginning of the police-station interrogation, references to the Defendant's conversations with "Tara," whose named was originally elicited in the minivan.  (*See* Hearing Ex. 1 at 1:38, 1:48, 1:57, 18:57, 21:38, 35:20, 40:50, 54:00, 56:30.)  Therefore, the police-station interrogation was not distinguishable from the unwarned interrogation in the minivan.  Rather, it was the conclusion of a continuous interrogation, which started in the minivan and moved into the home. Accordingly, this Court recommends that the statements made during the police-station interrogation also be held inadmissible during the Government's case-in-chief.

## RECOMMENDATION

**IT IS HEREBY RECOMMENDED** that:

1.     Defendant's Motion to Suppress Evidence Obtained by Search and Seizure (Doc. No. 34) be **DENIED**; and

2.     Defendant's Motion to Suppress Statements (Doc. No. 61) be **GRANTED**.


Date: December 19, 2008

s/Jeffrey J. Keyes
_____
JEFFREY J. KEYES
United States Magistrate Judge


Under D. Minn. LR 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties by January 6, 2009, a writing which specifically identifies those portions of this Report to which objections are made and the basis of those objections.  Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.  A party may respond to the objecting party's brief within ten days after service thereof.  All briefs filed under this rule shall be limited to 3500 words.  A judge shall make a de novo determination of those portions of the Report to which objection is made.  This Report and Recommendation does not constitute an order or judgment of the District Court, and it is therefore not appealable directly to the Circuit Court of Appeals.